**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WALDAMAR MILLER; THOMAS H.
SUDDUTH, JR.; J. DENTON ALLEN,
individuals,
                   *Plaintiffs-Appellants,*

                   v.

XEROX CORPORATION RETIREMENT
INCOME GUARANTEE PLAN, an
Employee Pension Benefit Plan;
XEROX CORPORATION, a New York
Corporation; PATRICIA NAZEMETZ,
as Plan Administrator of the
Xerox Corporation Retirement
Income Guarantee Plan,
                   *Defendants-Appellees.*

No. 04-55582

D.C. No.
CV-98-10389-WMB

WALDAMAR MILLER; THOMAS H.
SUDDUTH, JR.; J. DENTON ALLEN,
individuals,
                   *Plaintiffs-Appellants,*

                   v.

XEROX CORPORATION RETIREMENT
INCOME GUARANTEE PLAN, an
Employee Pension Benefit Plan;
XEROX CORPORATION, a New York
Corporation; PATRICIA NAZEMETZ,
as Plan Administrator of the
Xerox Corporation Retirement
Income Guarantee Plan,
                   *Defendants-Appellees.*

No. 04-55583

D.C. No.
CV-99-02589-WMB

AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
William Matthew Byrne, Senior Judge, Presiding

Argued and Submitted
December 9, 2005—Pasadena, California

Filed May 8, 2006
Amended September 13, 2006

Before: Harry Pregerson, John T. Noonan, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Thomas

**COUNSEL**

John A. Strain; Redondo Beach, California, for the appellants.

Lisa Von Eschen, Robert W. Perrin, and Lauren E. Kim; Latham & Watkins; Los Angeles; California, for the appellees.

**OPINION**

THOMAS, Circuit Judge:

This appeal presents the question of whether a procedure used by Xerox Corporation ("Xerox") to reduce pension benefits at final retirement to account for earlier benefit distributions violates the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1000 *et seq.* We conclude that Xerox's method violates ERISA, because it impermissibly reduces pension benefits by more than the accrued pension benefit attributable to the earlier distributions.

I

The facts of the case are undisputed. Plaintiffs Waldamar Miller, Thomas H. Sudduth, Jr., and J. Denton Allen ("the Employees"), all worked for Xerox for many years, received lump sum pension payouts when they left employment in 1983, and returned to work at the company several years later.

During their initial employment with Xerox, the Employees participated in two company retirement plans: the Xerox Retirement Income Guarantee Plan and the Xerox Profit Sharing Plan. The Income Guarantee Plan, a traditional defined benefit pension plan, provided participants with a certain percent of their salary in retirement for each year of service at Xerox, according to a specified formula ("Income Guarantee Plan formula benefit"). Under the Profit Sharing Plan, a defined contribution plan, each participant had an individual Retirement Account. The company made contributions to each employee's account, and the accounts were included in a fund invested and managed by the plan's trustees.

The two plans were linked in a "floor-offset" arrangement, under which the Income Guarantee Plan formula benefit served as the "floor" value of a retiree's pension benefits: each retiree would receive the value of his Retirement Account benefit, supplemented by the value of the Income Guarantee Plan formula benefit to the extent that it exceeded the Retirement Account benefit.

When each Employee left Xerox in 1983, he received a lump sum payment from his Retirement Account. Because the distribution from the Retirement Account in each case exceeded the lump-sum present value of the Employee's accrued benefit under the Income Guarantee Plan formula benefit, no payment was made from the Income Guarantee Plan itself. Although each Employee returned to work at Xerox sometime between 1987 and 1989, none of the Employees has repaid any portion of his Retirement Account distribution into any Xerox plan, nor do the plans require or permit such a repayment.

In 1989, Xerox restated and consolidated the Income Guarantee Plan and the Profit Sharing Plan. The restatement amended the Income Guarantee Plan formula, eliminated the Profit Sharing Plan, and replaced the Profit Sharing Plan with two new accounts within the Income Guarantee Plan: the Cash Balance Retirement Account and the Transitional Retirement Account. The new Income Guarantee Plan formula was based on the participant's highest average pay multiplied by 1.4% and the member's years of service up to 30 years. The Cash Balance Retirement Account, a "cash balance" plan, used the participant's existing Retirement Account balance as the initial balance, and received annual credits from Xerox of 5% of the participant's salary, plus interest at a fixed annual rate equal to the twelve-month Treasury Bill rate plus 1%. The Transitional Retirement Account consisted of the Retirement Account balance alone, and received no further contributions, but could grow or shrink according to the investment performance of the funds in

which the accounts were invested. Upon retirement, a participant received the largest of the three benefits — Income Guarantee Plan formula benefit, Cash Pension Retirement Account balance, or Transitional Retirement Account balance — in the form of an annuity.

For employees who had already received a distribution of pension benefits on a prior departure from the company, Xerox reduced final retirement benefits to account for the earlier distribution by using so-called "phantom accounts." Phantom accounts were calculated for the Cash Balance Retirement Account and the Transitional Retirement Account, consisting of the actual distribution amount at the time of departure plus the increase or decrease that the distribution would have earned had it remained in each plan. Thus, for the Cash Balance Retirement Account, the phantom account was equal to the distribution amount plus interest at the rate specified in the plan. For the Transitional Retirement Account, the phantom account was the distribution amount plus the investment returns (or losses) of the fund in which that amount had been invested at distribution.

Under the amended Income Guarantee Plan, the relevant phantom account was added to the amount of each participant's benefit before the three benefit choices were compared. The participant was given the benefit that yielded the highest monthly payment (with the phantom accounts included), and the phantom account was then subtracted out to yield the actual benefit amount. If the Income Guarantee Plan benefit was the largest, the Transitional Retirement Account phantom account was subtracted.

In 1997 and 1998, each of the Employees requested a statement of the benefits that would be payable upon his retirement. Each of the statements Xerox provided applied the phantom account offset described above, to drastic effect: Sudduth's monthly benefit fell from $1,679.23 to $83.16, Allen's monthly benefit fell from $2,059.44 to $262.69, and

Miller's monthly benefit fell from $2,878.40 to $554.51. The Employees challenged the phantom account offset, pursuing two levels of administrative appeals. Xerox rejected Miller and Sudduth's appeals by letter dated September 9, 1998, and rejected Allen's appeal by letter dated March 8, 1998.

Miller and Sudduth filed a complaint in the United States District Court for the Central District of California on December 23, 1998. Allen filed his complaint on March 12, 1999. The two cases were stayed in June 1999 pending resolution of the appeal in *Hammond v. Xerox Corp. Retirement Income Guarantee Plan*, No. 97-8349, 1999 WL 33915859 (C.D. Cal. April 8, 1999), which raised different challenges to the 1989 plan amendments at issue here. After *Hammond* was affirmed in an unpublished decision, the Employees filed amended complaints in both actions. The parties then filed stipulated facts and exhibits. The two cases were formally consolidated on January 4, 2002, and a trial consisting of closing arguments was held on April 3, 2002.

The district court granted judgment for Xerox, holding that the "phantom account" mechanism did not violate ERISA. The court also found that Xerox's disclosure of the method had been inadequate in documents issued in 1993, but that the Employees were not entitled to any remedy for that deficient disclosure because they had neither relied on that disclosure nor been prejudiced by it. The Employees timely filed this appeal. Because this appeal presents only questions of law, our review is *de novo*. *Michael v. Riverside Cement Co. Pension Plan*, 266 F.3d 1023, 1026 (9th Cir. 2001).

II

Xerox's method of accounting for prior distributions in calculating the Employees' final retirement benefits violates the substantive requirements of ERISA. The Income Guarantee Plan phantom offset violates ERISA by overestimating the value of distributions made upon a previous separation from

employment, and the corresponding reduction in benefits at retirement. ERISA requires actuarial equivalence between the actual distribution and the accrued benefit it replaces.

[1] As a hybrid defined benefit plan with some features of a defined contribution plan,[1] the Income Guarantee Plan (both before and after amendment, and including the Cash Balance Retirement Account component) must satisfy the actuarial rules ERISA applies to defined benefit plans.[2] 29 U.S.C. § 1002(35). It is well settled that ERISA allows so-called "floor-offset" plans, in which the participant takes the greater of a defined benefit or a defined contribution benefit amount.[3]

---

[1]ERISA defines a "defined benefit plan" as "a pension plan other than an individual account plan," but also permits hybrid plans. 29 U.S.C. § 1002(35). The Profit Sharing Plan was a defined contribution plan, which ERISA defines as "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

[2]This statutory requirement is explicit, and reads as follows:

> [A] pension plan which is not an individual account plan and which provides a benefit derived from employer contributions which is based partly on the balance of the separate account of a participant — . . .

> (B) for the purposes of paragraph (23) of this section [defining accrued benefit] and section 1054 of this title [regulating benefit accrual], shall be treated as an individual account plan to the extent benefits are based upon the separate account of a participant and as a defined benefit plan with respect to the remaining portion of benefits under the plan.

29 U.S.C. § 1002(35).

[3]A pension plan participant's "accrued benefit" is, "in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and, except as provided in [29 U.S.C. § 1054(c)(3)], expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A). The normal form of this benefit is a joint and survivor annuity. 29 U.S.C. § 1055(a)(1). "[I]n the case of a plan which is an individual account plan," the accrued benefit is simply "the balance of the individual's account." 29 U.S.C. § 1002(23)(B).

However, the defined benefit and defined contribution portions of a combined floor-offset plan must satisfy the ERISA requirements applicable to the respective types of plans.

Here, the distributions made to the Employees in 1983 were intended to satisfy Xerox's obligations under both the Profit Sharing Plan and the Income Guarantee Plan, although they were made solely from the Profit Sharing Plan, because the Profit Sharing Plan account balance exceeded the value of the Income Guarantee Plan formula. When the distributions are viewed as a free-standing defined contribution plan benefit, they cause no difficulty: the Employees received the full amount of their individual account balances, and the rules for defined contribution pension plans require no more.

**[2]** The trouble arises in integrating the distributions with Xerox's obligations under the defined benefit portion of its pension plans. The Income Guarantee Plan guaranteed the Employees a minimum total retirement benefit, and provided benefits to the extent the Profit Sharing Plan failed to satisfy that minimum. The Income Guarantee Plan's promise of a defined benefit amount triggered ERISA's defined benefit plan rules, which require that any lump-sum substitute for an accrued pension benefit be the actuarial equivalent of that benefit. 29 U.S.C. § 1054(c)(3). Some reduction of future pension benefits to account for the prior distributions is appropriate, but only to the extent that the future benefit is "attributable to the distribution."[4] 26 C.F.R. § 1.411(a)-7(d)(6).

---

[4]IRS regulations that also apply to the parallel ERISA provisions, *see* ERISA § 3002(c), 29 U.S.C. § 1202(c), permit such reductions as follows:

> [T]he fact that a plan cannot disregard an accrued benefit attributable to service for which an employee has received a distribution because the plan does not satisfy the cash-out requirements of [ERISA's buyback rules] does not mean that the employee's accrued benefit (computed by taking into account such service) cannot be offset by *the accrued benefit attributable to the distribution*.

26 C.F.R. § 1.411(a)-7(d)(6) (emphasis added).

**[3]** An accrued benefit under a defined benefit plan is ordinarily expressed as an annuity commencing at normal retirement age. *See* 29 U.S.C. § 1002(23)(A). Thus, the "accrued benefit attributable to the distribution" for each Employee should be expressed as an annuity. When the Employees first left Xerox, they received Profit Sharing Plan distributions because their Profit Sharing Plan account balances exceeded the benefit which they were guaranteed under the Income Guarantee Plan formula. These distributions can, of course, be offset from the benefits guaranteed under the Income Guarantee Plan formula. However, because ERISA requires actuarial equivalence for any reduction in benefits based on prior distributions, Xerox's method of *calculating* the offset is impermissible. The benefit properly attributable to the Profit Sharing Plan distributions is simply the Income Guarantee Plan annuity amount that those distributions would have provided. Any later change in the value of the distribution should not affect the amount of the benefit under the Income Guarantee Plan defined benefit formula that was attributable to the distribution when it was made. Although floor-offset plans are permissible, the offset permitted is not one increased post hoc by Xerox, but one based on the actual actuarial equivalent of the distribution.[5] In short, Xerox may not use a projected-to-

---

[5]The actuarial equivalence requirement applies indirectly here: the promised benefit at issue is the amount by which the Income Guarantee Plan formula benefit exceeds the value of the Profit Sharing Plan account balance. The phantom account device distorts the value of the Profit Sharing Plan account, not the Income Guarantee Plan formula itself. However, ERISA's actuarial equivalence requirement would be meaningless — which, even in this indirect, floor-offset context, it cannot be — if Xerox could simply redefine at will the Profit Sharing Plan balance actually distributed, thereby reducing its Income Guarantee Plan obligations. We do not consider here nor disapprove the use of benefit offsets in general, which the courts have plainly sanctioned, or the Profit Sharing Plan offset itself, but only the actuarial sleight of hand behind the phantom account offset. We note, also, that the benefit offsets previously sanctioned have involved not phantom benefit enhancements imagined by an employer, but more mundane creatures such as Social Security or workers compensation benefits, or complementary pension benefits from other plans, which workers actually receive. *See, e.g., Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981).

the-present value generated from a phantom account as a proxy for the actual distribution amount.

The logic of this is more readily apparent when one compares this situation to one in which a participant receives a lump-sum distribution from a straight defined benefit plan (i.e., one without a floor-offset arrangement), and then resumes employment under the same plan. If the participant worked for 10 years, left the company, and received a lump-sum distribution actuarially equivalent to a $300/month annuity (say 1.5% of a $2000/month salary for each year), the plan could subtract the $300/month "accrued benefit" represented by that distribution from a later calculation of benefits after the participant resumed employment and worked another 20 years.[6] Nothing in the regulations or the statute, however, would permit the company to subtract more than that $300/month "accrued benefit attributable to the distribution."

[4] Here, Xerox essentially seeks instead to recalculate the "accrued benefit" satisfied by the initial distribution based on later developments, namely investment performance of the funds in which the money would have been held, had it not been distributed. The rate of return on Xerox's funds is not actuarially relevant to the accrued benefit that the distribution

---

[6]Because pensions depend on a participant's salary at the end or highest point of his career as well as on his years of service, subtracting the $300/month would cause a less drastic reduction than simply disregarding the prior years of service completely (which would require the plan to comply with ERISA's "buyback" rules): the participant would be entitled to a percentage of the higher salary earned during the second period of employment not only for the years of the second period, but also for the initial period. Based on a final salary of $4000/month, for example, the participant would receive a final benefit (not including the $300/month equivalent already distributed) of $1500/month under this system (1.5% of $4000/month times 30 years, minus $300/month), instead of $1200/month (1.5% of $4000/month times 20 years) if the first period of employment were excluded entirely. The employee would thus accrue some additional benefit — over the benefit already paid — for the initial years of employment.

satisfied. Xerox's approach is the equivalent, in the above example, of the company seeking to subtract more than the initial $300/month accrued benefit from the final benefit payment, on the grounds that the participant could purchase a larger annuity with the prior distribution amount at the time of final benefit calculation due to his shorter life expectancy or changed discount rate assumptions, or assumed investment returns on the distribution amount. Nothing in the statute or in logic permits this revisionist approach to already-distributed accrued benefits, nor is it more permissible in the context of a floor-offset plan, since such a plan must still satisfy the rules for ordinary defined benefit plans.

Although no court appears to have addressed the precise claim presented here, our approach is consistent with that of other courts of appeals. In *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755 (7th Cir. 2003), for example, the Seventh Circuit found that Xerox's method of calculating lump-sum distributions under the Cash Balance Retirement Account component of the Income Guarantee Plan violated ERISA's requirement of actuarial equivalency.[7] Although the case is not strictly analogous, because it addressed only the proper calculation of lump sum distributions under the Cash Balance Retirement Account (not the "phantom accounting" for prior distributions that the Employees challenge), our approach is compatible with *Berger*'s discussion of the nature of actuarial equivalence, and its

---

[7]More recently, the Second Circuit held in *Frommert v. Conkright*, 433 F.3d 254 (2d Cir. 2006), that Xerox's phantom account mechanism was not properly added to the plan until 1998, and that it would constitute an impermissible reduction of benefits if applied to employees rehired by Xerox prior to 1998. *Id.* at 256-57. The *Frommert* court also required the district court to reconsider the plaintiffs' claims of fiduciary breach based on Xerox's alleged misrepresentations of the amended plan's terms. *Id.* at 257. Although this case presents different issues, and we do not reach the Employees' disclosure-related claims, *Frommert*'s analysis of the Xerox plan's broader defects reinforces our own conclusion that Xerox's phantom account mechanism falls short of ERISA's requirements.

application of ERISA's defined benefit plan rules to some-
what murky "hybrid" plans. *Id*. at 759-60. The same is true of
*Esden v. Bank of Boston*, 229 F.3d 154 (2d Cir. 2000), in
which the Second Circuit reached the same conclusion as *Ber-
ger* in considering a similar plan.

   Xerox argues that, because participants in the Profit Shar-
ing Plan/Transitional Retirement Account received invest-
ment growth as part of their benefit, it is proper to project that
growth forward to retirement when determining the actuarial
equivalent benefit, just as was done with the Cash Balance
Retirement Account interest credits under that plan in *Berger*.
However, the Cash Balance Retirement Account interest cred-
its are defined benefit entitlements specified by the plan
terms, and are not analogous to the investment growth of a
defined contribution plan. Unlike the Cash Balance Retire-
ment Account benefits, defined contribution benefits under
the Profit Sharing Plan came with no guarantees, and did not
depend in any way on projected value at retirement; rather,
the plan simply provided participants with the account bal-
ance, whatever it might be. Xerox clearly realized the differ-
ence: although Xerox projected each retiree's Cash Balance
Retirement Account balance forward to retirement and then
discounted the projected amount to express it as a present-day
lump sum (using too high a discount rate, according to *Ber-
ger*), the company made no such projections for the Profit
Sharing Plan. Instead, Xerox simply distributed each partici-
pant's Profit Sharing Plan account balance if — as in the case
of the Employees — it exceeded the lump-sum value of the
Income Guarantee Plan formula benefit.

   **[5]** The applicable regulations permit a plan to subtract
from a final defined benefit only the "accrued benefit attribut-
able to the [prior] distribution." Xerox's "phantom account"
offset exaggerates the amount of "accrued benefit" under the
Income Guarantee Plan attributable to the Employees' Profit
Sharing Plan distributions, in violation of those regulations,
by deducting from the Employees' benefits the distribution's

hypothetical value at final retirement, rather than the benefit attributable to the distribution itself. The Employees — and all other plan participants subject to similar benefit adjustments — are entitled to a calculation of benefits that subtracts from their final Income Guarantee Plan benefit only the benefit actually attributable to the Profit Sharing Plan distributions.

## III

**[6]** Because Xerox improperly overstated the benefit attributable to the Profit Sharing Plan distributions the Employees received in 1983, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**