**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
November 17, 2009

No. 09-50381
Summary Calendar

Charles R. Fulbruge III
Clerk

KATHLEEN A. STEWART, Individually and on behalf of all others similarly situated,

Plaintiff - Appellant

v.

AT&T INC; AT&T PENSION BENEFIT PLAN-NONBARGAINED PROGRAM,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:08-cv-272

Before KING, STEWART and HAYNES, Circuit Judges.

PER CURIAM:[*]

This appeal arises under the Employee Retirement Income Security Act (ERISA). 29 U.S.C. § 1001 *et seq.* Appellant Kathleen A. Stewart asserts that her employer's plan administrator failed to pay her the full amount of the lump–sum payment that she was entitled to under the company's defined–benefit pension plan. Specifically, she argues that the plan

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

administrator abused its discretion by using a pre–retirement mortality discount to calculate her lump–sum retirement payment. The parties filed cross–motions for summary judgment. The district court held that the plan administrator did not abuse its discretion, and granted the employer's motion for summary judgment. Stewart appeals. We AFFIRM.

## I. FACTS & PROCEDURAL HISTORY

Appellant Kathleen A. Stewart worked for Ameritech Services, Inc. (Ameritech) from 1971 to 1996.[1] As an employee, she participated in the Ameritech Management Pension Plan (AMPP), a defined–benefit pension plan.[2] Prior to her termination, Stewart's accrued benefit under the AMPP was expressed as a defined lump sum.[3] AMPP § 5.1(a). When her employment was terminated in 1996, the defined lump–sum amount was converted into an age–65 annuity, the standard means of receiving retirement benefits under the plan. AMPP § 5.1(b). However, the plan allowed Stewart to elect—within 60 days of her termination—to receive her retirement benefit in a lump–sum payment. AMPP § 7.3(b). Stewart exercised this option.

To calculate the lump–sum payment due to Stewart, the plan administrator converted the defined lump–sum amount into the age–65 annuity. The amount of the annuity was determined by calculating the future value of Stewart's defined lump sum, in recognition of the fact that Stewart was not then 65, and thus the annuity would only be payable in the future. In doing so, the plan administrator applied pre– and post–retirement mortality discounts, as

---

[1] Ameritech is now known as AT&T Inc., the appellee in this action.

[2] In 2004, the AMPP merged into AT&T Pension Benefit Non-Bargained Program, the appellee in this action. Co-appellee AT&T administers the AT&T Pension Benefit Non-Bargained Program or the ATTP.

[3] The defined lump sum was calculated based on Stewart's final average compensation multiplied by her aggregate lump–sum percentage.

well as the applicable interest rates set by the Pension Benefit Guaranty Corporation (PBGC). The mortality discounts accounted for the probability that Stewart would either die before reaching the age of 65, in which case her annuity would be forfeited, or the probability that Stewart would die after her annuity payments had commenced, in which case the payments would cease.[4]

After determining the amount of Stewart's annuity, the plan administrator converted the figure into a lump–sum amount based on its present value. In reducing the annuity to its present value, the plan administrator relied upon the same PBGC interest rates and mortality tables used to calculate the future value of the annuity. As a result, when her employment was terminated in 1996, Stewart received a lump–sum payment of $110,450.36. This amount is equal to the amount of her defined lump sum.

Stewart filed an administrative claim challenging the plan administrator's calculation of her lump–sum payment. She argued that the plan administrator erred by using a pre–retirement mortality discount to calculate the amount of her lump–sum payment. Specifically, she asserted that the pre–retirement mortality discount applies only to the disbursement of the age–65 annuity, but does not apply when a participant elects a lump-sum payment. As a result, Stewart sought to recover over $21,000.00 in benefits.[5]

The plan administrator denied her claim. After exhausting her administrative remedies, Stewart brought a civil action under 29 U.S.C. § 1132(a)(1)(B) to recover the amount of money discounted based on the

---

[4] The plan provides certain exceptions to the general rule that the annuity payment may be forfeited if the participant dies before reaching the age of 65. Because those exceptions are not before this court, we do not address them here.

[5] Specifically, Stewart argues that she should have received $132,358.66.

pre–retirement mortality calculation.[6] The parties filed cross–motions for summary judgment in the district court. The district court granted AT&T's motion for summary judgment and held that the lump–sum payment awarded to Stewart complied with the terms of the plan. Accordingly, the district court held that the plan administrator did not abuse its discretion by using a pre–retirement mortality discount.

On appeal to this court, Stewart argues that the district court erred by concluding that the plan administrator did not abuse its discretion. She argues that § 7.4(d) of the AMPP prohibits the plan administrator from using a pre–retirement mortality discount to compute lump–sum pension benefits. Because the plan provides that the lump sum will still be paid in the event that the employee dies in the short time *between* electing the lump sum and receiving the payment, Stewart argues that the plan administrator violated ERISA's anti–forfeiture rule by applying a discount for the probability that Stewart would die before reaching age 65. *See* 29 U.S.C. § 1053(a).

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, applying the same standard as the district court. *Crowell v. Shell Oil Co.*, 541 F.3d 295, 312 (5th Cir. 2008). Because the terms of the AMPP give the plan administrator discretionary authority to construe the terms of the plan and apply its provisions, we review the plan administrator's decision for an abuse of discretion.[7] Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); see

---

[6] Stewart initially filed this case in the United States District Court for the Southern District of Ohio; the case was later transferred to the United States District Court for the Western District of Texas.

[7] Section 11.1(c) of the AMPP confers discretion upon the plan administrator to interpret the terms of the plan. Stewart briefly asserts that the plan administrator failed to exercise any discretion in the administrative proceedings, but this argument is without merit. The administrative record shows that the plan administrator interpreted the plan provisions to require a computation of Stewart's lump–sum benefit by using a pre–retirement mortality

also Stone v. UNOCAL Termination Allowance Plan, 570 F.3d 252, 257 (5th Cir. 2009) ("Because the Plan gives the Committee discretionary authority to construe Plan terms and apply its provisions, its decision is reviewed under an abuse of discretion standard."). In reviewing the plan administrator's decision, we limit our review to the administrative record and ask "only whether the record adequately supports the administrator's decision." Jenkins v. Cleco Power, LLC, 487 F.3d 309, 314 (5th Cir. 2007) (quotation marks and citation omitted).[8]

This court applies a two–step process to determine whether a plan administrator has abused its discretion. Stone, 570 F.3d at 257. First, this court asks whether the plan administrator's decision was legally correct. Id. If the decision was legally correct, our inquiry ends there. But if we determine that the administrator's decision was not legally correct, we ask whether the decision was an abuse of discretion. Id. "A plan administrator abuses its discretion where the decision is not based on evidence, even if disputable, that clearly supports the basis for its denial." Holland v. Int'l Paper Co. Ret. Plan, 576 F.3d 240, 246 (5th Cir. 2009) (quotations and citations omitted). An abuse of discretion occurs if the plan administrator has acted arbitrarily or capriciously. Id. We make a finding of arbitrariness only if the decision is "made without a rational connection between the known facts and the decision or between the found facts and the evidence." Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Michigan, 97 F.3d 822, 828 (5th Cir. 1996).[9]

---

discount.

[8] The parties make numerous arguments that were not presented during the administrative proceedings. We limit our review of the administrator's decision to the evidence contained in the administrative record. *Jenkins*, 487 F.3d at 314.

[9] Stewart does not assert that the plan administrator operated under a conflict of interest. If she did, we would "weigh the conflict of interest as a factor in determining whether there is an abuse of discretion in the benefits denial." *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct.

## III. ANALYSIS

We begin our analysis by asking whether the plan administrator's decision was legally correct. In making this determination, we consider

> (1) whether the administrator has given the plan a uniform construction,
>
> (2) whether the interpretation is consistent with a fair reading of the plan, and
>
> (3) any unanticipated costs resulting from different interpretations of the plan.

Crowell v. Shell Oil Co., 541 F.3d 295, 312 (5th Cir. 2008) (quotation marks and citation omitted). The second question—whether the plan administrator's interpretation is consistent with a fair reading of the plan—is the "most important factor to consider." Id. (citation and quotation omitted).

### A. The Terms of the Plan

The plan administrator concluded that the terms of the plan authorize the application of a pre–retirement mortality discount when computing the amount of the lump–sum payment. The administrator based its decision on §§ 5.1 and 7.3(b) of the plan. See AR 000000088. Section 5.1(a) of the plan defines a participant's accrued benefit as a defined lump sum prior to termination. Section 5.1(b) states that at and after a participant's termination date, the accrued benefit is converted into an age–65 annuity based on the applicable PBGC interest rates and the plan mortality tables. When an employee elects to receive a lump–sum payment, § 7.3(b) states that the payment will be calculated based on the present value of the age–65 annuity, determined using the PBGC interest rates and the plan mortality tables.[10] The plan administrator

_____

2343, 2350-51 (2008).

[10] Section 7.3(b) states that a participant may—within 60 days of the participant's termination date—elect to receive a

interpreted the plan language to require the same actuarial factors to be used in calculating the age–65 annuity under § 5.1(b) and § 7.3(d).[11] Thus, the plan administrator applied the same pre– and post–retirement mortality discounts to make the lump–sum calculation as it did to make the age–65 annuity calculation.

Stewart argues that the use of a pre–retirement mortality discount is prohibited when an employee elects to receive a lump–sum payment. She does not dispute the use of a post–retirement mortality discount to calculate the lump–sum payment; rather, Stewart argues only that a pre–retirement mortality discount may not be used. She asserts that § 7.4(d) of the AMPP makes the lump-sum payment non–forfeitable in the event that she dies before turning 65.

Section 7.4(d) states:

> If a Participant who has filed a valid distribution election dies prior to his Annuity Starting Date, such election shall be void and his Accrued Benefit shall be paid in accordance with subsection 9.2 or 9.3, whichever is applicable. If a Participant who has properly elected

---

> Lump Sum payment which is the present value of the Participant's Accrued Benefit under paragraph 5.1(b), determined using (i) the applicable PBGC rate for the January 1 of the calendar year in which the Participant's Annuity Starting Date occurs and (ii) the Plan's Mortality Table. Except as expressly provided in subsection 7.4 a Lump Sum payment will only be made to the Participant as of his Termination Date.

[11] Stewart asserts that the plan administrator never performed a present-value computation, but this assertion is in error. The plan administrator communicated its calculations to Stewart by letter during the administrative proceeding, and explained that it converted Stewart's defined lump sum into an annuity payment by determining the "actuarially equivalent benefit to her age 65 benefit." The administrator then converted this sum into a lump–sum payment. AR 000000089.

a Lump Sum dies after his Annuity Starting Date[12] but prior to actual receipt of such distribution, the Lump Sum shall be paid to his estate when it would otherwise have been paid to the Participant or as soon as practicable thereafter.

Stewart asserts that this provision prevents application of a pre–retirement mortality discount—which discounts for the probability that the benefit will be forfeited by death prior to age 65—to lump–sum payments under §7.3(b). This is not so.

A plain reading of §§ 5.1(b) and 7.3(d) supports the plan administrator's interpretation of the plan.

First, both § 5.1(b) and § 7.3(d) contain the same language authorizing use of the applicable PBGC interest rates and plan mortality tables to calculate the amount owed to the participant.[13] Stewart acknowledges that the language of § 5.1(b) allows the plan administrator to apply a pre–retirement mortality discount to calculate the future value of her annuity. The plan administrator interpreted the plan language to require the same actuarial factors to be used in calculating the age–65 annuity under § 5.1(b) and § 7.3(d). This interpretation provides a uniform construction of the plan.[14]

---

[12] As relevant here, the "Annuity Starting Date" "means the day [s]he retires or otherwise terminates employment." AMPP § 7.1.

[13] Stewart correctly points out that the plan mortality tables do not state which mortality decrements should be used; rather, that determination depends on whether the benefit may be forfeited. Nonetheless, the language used in § 7.3(d) does not suggest a different calculation than the one performed under § 5.1(b).

[14] Stewart argues that the plan administrator provided divergent rationales for denying her benefits in the administrative proceedings and the district court. To the extent that both of the parties raised new arguments in the district court, we confine our review to the administrative record and ask only whether the record evidence shows that the plan administrator's decision was legally correct.

Second, the plan administrator's interpretation is consistent with a fair reading of the plan. Section 7.3(d) states that the lump–sum payment should equal the present value of the age–65 annuity. Stewart was not yet 65 when she elected to receive her lump–sum payment. Because it was still possible for Stewart to die prior to reaching the age of 65, it makes logical sense for the plan administrator to discount for the probability that Stewart would forfeit her annuity before reaching the age of 65. Thus, the plan administrator took this probability into account in determining the present–value of Stewart's annuity.

Stewart's reliance on § 7.4 is unavailing. Section 7.4 states only that the lump–sum payment will be made to the participant's estate in the event the participant dies during the relatively short time period after electing a lump–sum payment but before the payment is actually received. It addresses the happenstance of, for example, a participant making the election one morning and then dying in a car accident that afternoon. Thus, this provision deals with payment, but it has no bearing on the method by which the lump sum is calculated. Section 7.3 governs the computation of the lump–sum payment, and provides that the amount due must be the present value of the age–65 annuity. It also provides that the present value must be determined by using the applicable PBGC interest rates and the plan mortality tables.

Third, § 7.4(d) does not preclude a participant's benefits from being forfeited by death as a general matter, but only in limited circumstances. The parties agree that a participant who elects the standard monthly age–65 annuity payment may forfeit the annuity if he or she dies before reaching the age of 65. Stewart acknowledges this but argues that lump–sum payments are made non–forfeitable under § 7.4(d). But that provision does not provide a different mechanism of valuing the participant's annuity. For example, § 7.4 does not provide that, by electing a lump–sum payment, the participant becomes entitled to the full value of the age–65 annuity without regard to the probability of the

participant dying before reaching the age of 65. Nor does such an argument make sense. The lump–sum payment is intended to be the present value of the annuity, which remains subject to forfeiture if the participant dies before reaching normal retirement age. Section 7.4 simply does not entitle a participant to the full value of an age–65 annuity when that participant has yet to turn 65.

Put another way, the pre–retirement mortality table discounts for the probability that the annuity will be forfeited if Stewart dies before reaching the age of 65; it does not discount for the probability that the lump–sum payment will be forfeited upon election of that option. Thus, the application of the pre–retirement mortality discount does not result in a forfeiture of the lump–sum payment. It merely calculates the present value of the participant's annuity, and reduces that to a lump–sum payment. Once vested by the participant's election and calculated according to § 7.3, the lump sum is not forfeitable – as § 7.4 provides, the sum goes to the participant's estate should the participant die between election and receipt. In sum, the plan administrator's interpretation produces a fair reading of the plan that accords with common sense.

Finally, AT&T urges that Stewart's interpretation would result in a more costly payout because the lump–sum payment would become more valuable than the age–65 annuity. This argument, while clearly insufficient on its own, also demonstrates why Stewart's interpretation of the plan is illogical.

Based on our review of the record, we conclude that the plan administrator's interpretation of the plan is legally correct. We base this conclusion on our finding that the administrator gave the plan a uniform construction, and that interpretation is consistent with a fair reading of the plan's language. Accordingly, we affirm the district court's conclusion that the plan administrator's interpretation of the plan is legally correct.

B. ERISA Compliance

Stewart asserts that use of a pre–retirement mortality discount to determine her lump–sum payment violates ERISA because it results in a partial forfeiture of her benefits. ERISA provides that, once a retirement benefit is fully vested, a plan participant may not forfeit their benefits unless the plan expressly provides for such forfeiture upon the death of the participant. 11 U.S.C. § 1053(a); see also Treas. Reg. § 1.411(a)-4 (stating that a right to an accrued benefit is non–forfeitable if it is expressed as an unconditional right).

Here, the terms of the plan make clear that the age–65 annuity are forfeited if the participant dies before reaching the age of 65. Stewart again relies on § 7.4 to argue that the lump–sum payment may not be forfeited upon death, even if the annuity payments may be. But this argument fails for the reasons set forth above. As a result, the use of a pre–retirement mortality discount was permissible under ERISA because the plan expressly conditioned receipt of the annuity payments upon reaching the age of 65. See Treas. Reg. § 31.3121(v)(2)-1(c)(2)(ii) (stating that "present value [of an annuity] means the value as of a specified date of an amount or series of amounts due thereafter, where each amount is multiplied by the probability that the condition or conditions on which payment of the amount is contingent will be satisfied, and is discounted according to an assumed rate of interest to reflect the time value of money") (emphasis added). Accordingly, the plan administrator was authorized to discount for the probability that Stewart would die before the annuity benefits commenced in calculating the lump–sum payment. Id.

Stewart argues that the district court's decision is contrary to West v. AK Steel Corp. Retirement Accumulation Plan, 484 F.3d 395 (6th Cir. 2007), and Berger v. Xerox, 338 F.3d 755 (7th Cir. 2003). In West and Berger, the courts found that the plan administrators erred in calculating the lump–sum payments

owed to beneficiaries under the terms of the cash–balance benefit plans.[15] Those cases addressed plans with different terms than the one at issue here.

In contrast to the plans in Berger and West, the annuity in the present case may be forfeited if the participant dies before reaching the age of 65. Consequently, applying a pre–retirement mortality discount in the present case does not cause a participant to forfeit an already accrued benefit. Instead, the plan administrator used the pre–retirement mortality discount to reduce the annuity—which is subject to forfeiture—to its present value by taking into account the probability that Stewart would not reach the age of 65.

In sum, the plan administrator's use of a pre–retirement mortality discount was permissible under ERISA. Stewart is thus not entitled to monetary or equitable relief under ERISA.[16]

## IV. CONCLUSION

We conclude that the plan administrator's interpretation of the AMPP plan was legally correct and did not violate any provision of ERISA. The district court did not err in granting summary judgment in favor of the appellees. AFFIRMED.

---

[15] Cash balance plans differ substantially from the plan at issue in this case. A cash balance plan "entitles the employee to a pension equal to (1) a percentage of his salary every year that he is employed (5 percent, in the case of the Xerox plan) plus (2) annual interest on the 'balance' created by each yearly 'contribution' of a percentage of the salary to the employee's 'account,' at a specified interest rate . . . These annual increments of interest are called future interest credits." Berger, 338 F.3d at 758. In contrast, the AMPP is more aptly characterized as a standard defined benefit plan because it entitles the participating employee to a pension equal to percentage of his or her final years' salary multiplied by years of service.

[16] In her complaint, Stewart also sought equitable injunctive relief under § 502(a)(3). Because we determine that the plan administrator's decision was legally correct, we find that Stewart is not entitled to *any* relief under ERISA, and do not reach the issue of whether she preserved a claim for equitable relief.