Laurent v. PricewaterhouseCoopers LLP

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

––––––––––

August Term, 2014

(Argued: April 14, 2015      Decided: July 23, 2015)

Docket No. 14-1179

––––––––––

TIMOTHY D. LAURENT, SMEETA SHARON,

*Plaintiffs-Appellees,*

MICHAEL A. WEIL,

*Plaintiff,*

— v. —

PRICEWATERHOUSECOOPERS LLP, THE RETIREMENT BENEFIT ACCUMULATION PLAN FOR EMPLOYEES OF PRICEWATERHOUSECOOPERS LLP, THE ADMINISTRATIVE COMMITTEE TO THE RETIREMENT BENEFIT ACCUMULATION PLAN FOR EMPLOYEES OF PRICEWATERHOUSECOOPERS LLP,

*Defendants-Appellants.*[*]

––––––––––

[*] The Clerk of Court is respectfully directed to amend the official caption in this case to conform to the caption above.

1

CABRANES, LYNCH, and DRONEY, *Circuit Judges*.

_____

Former employees of PricewaterhouseCoopers LLP sued the company and its retirement plan, alleging that the plan violated the Employee Retirement Income Security Act of 1974 ("ERISA"). The plan defines "normal retirement age" as five years of service, so that it coincides with the time at which employees vest in the plan. Plaintiffs allege that this scheme deprives plan participants of so-called "whipsaw payments," which guarantee that participants who take distributions in the form of a lump sum when they terminate employment will receive the actuarial equivalent of the value of their accounts at retirement. The district court (J. Paul Oetken, *Judge*) denied defendants' motion to dismiss, holding that the PricewaterhouseCoopers plan violated ERISA because (1) five years of service is not an "age" under ERISA, (2) the plan violated ERISA's anti-backloading rules, and (3) the plan's documents violated ERISA's notice requirements. We agree that the plan violates ERISA, but for different reasons than those cited by the district court. We hold that the plan's definition of

2

"normal retirement age" as five years of service violates the statute not because

five years of service is not an "age," but because it bears no plausible relation to

"normal retirement." We therefore AFFIRM, without reaching the district court's

alternative reasons for denying defendants' motion to dismiss.

———————————

DANIEL J. THOMASCH, Gibson, Dunn & Crutcher LLP, New York, NY (Richard W. Mark, Amer S. Ahmed, Gibson, Dunn & Crutcher LLP, New York, NY; Robert J. Kopecky, Kirkland & Ellis LLP, Chicago, IL, *on the brief*), *for defendants-appellants*.

JULIA PENNY CLARK, Bredhoff & Kaiser, PLLC, Washington, DC (Eli Gottesdiener, Gottesdiener Law Firm, PLLC, Brooklyn, NY, *on the brief*), *for plaintiffs-appellees*.

———————————

GERARD E. LYNCH, *Circuit Judge*:

The Employee Retirement Income Security Act of 1974 ("ERISA"), as

amended 29 U.S.C. § 1001 *et seq.*, protects retirement benefits that have accrued

over the course of an employee's tenure until that employee reaches normal

retirement age. The question in this case is how much leeway retirement plan

sponsors have to define what "normal retirement age" is, in order to avoid

paying future interest credits when the employee leaves employment and elects

3

to receive the value of his or her retirement account in a lump-sum distribution.

Plaintiffs, former employees of PricewaterhouseCoopers LLP ("PwC"), sued the

company and its retirement plan, alleging that the plan violated ERISA. The plan

defines "normal retirement age" as five years of service, so that it coincides with

the time at which employees vest in the plan. Plaintiffs allege that this scheme

deprives them of so-called "whipsaw payments," which guarantee that plan

participants who take distributions in the form of a lump sum when they

terminate employment will receive the actuarial equivalent of the value of their

accounts at retirement.

Defendants moved to dismiss the complaint. The district court (J. Paul

Oetken, *Judge*) denied the motion to dismiss, holding that the PwC plan violated

ERISA because (1) five years of service is not an "age" under ERISA, (2) the plan

violated ERISA's anti-backloading rules, and (3) the plan's documents violated

ERISA's notice requirements. It then certified its decision for interlocutory

review, and we accepted the certification. We agree that the plan violates ERISA,

but for different reasons than those cited by the district court.[1] We hold that the

---

[1] We may affirm on any ground the record supports, and are not limited to the reasons expressed by the district court. See Grieve v. Tamerin, 269 F.3d 149, 154 (2d Cir. 2001).

plan's definition of "normal retirement age" as five years of service violates the statute not because five years of service is not an "age," but because it bears no plausible relation to "normal retirement," and is therefore inconsistent with the plain meaning of the statute. We accordingly AFFIRM, without reaching the district court's alternative reasons for denying defendants' motion to dismiss.

**BACKGROUND**

Before discussing plaintiffs' suit and the issues raised on appeal, it is necessary to provide some background on ERISA and how its minimum vesting provisions apply to the kind of plan that PwC offers its employees, in order to clarify the framework in which those issues must be analyzed.

I.      ERISA's Vesting Requirements for Cash Balance Plans

Congress passed ERISA in response to findings that inadequate vesting protections in private retirement plans were causing retirees to lose their anticipated benefits. See 29 U.S.C. § 1001(a). The statute addresses that problem largely by imposing various requirements on plans as a condition for receiving preferential tax treatment. ERISA recognizes two basic types of retirement plans: defined contribution plans (also known as individual account plans) and defined benefit plans. A defined contribution plan is "a pension plan which provides for

5

an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses." ERISA § 3(34); 29 U.S.C. § 1002(34).[2] By contrast, a defined benefit plan consists of a general pool of assets, which may be funded by employer or employee contributions, or a combination of both, and guarantees a defined level of benefits, known as accrued benefits, which are "expressed in the form of an annual benefit commencing at normal retirement age." ERISA § 3(23)(A); 29 U.S.C. § 1002(23)(A); see Lonecke v. Citigroup Pension Plan, 584 F.3d 457, 461-62 (2d Cir. 2009).

In order to qualify as ERISA-compliant, retirement plans must meet the statute's "[n]onforfeitability requirements." See ERISA § 203(a); 29 U.S.C. § 1053(a). Those requirements are minimum vesting standards mandating that "[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." Id. In addition, specifically for defined benefit plans, a plan satisfies the

---

[2] The familiar 401(k) – so called because it is a tax-qualified profit-sharing plan with a cash or deferred arrangement within the meaning of section 401(k) of the Internal Revenue Code – is a common example of a defined contribution plan. See Hirt v. Equitable Ret. Plan for Emps., Managers & Agents, 533 F.3d 102, 104 (2d Cir. 2008).

nonforfeitability requirements if, *inter alia*, "an employee who has completed at least 5 years of service has a nonforfeitable right to 100 percent of the employee's accrued benefit derived from employer contributions." 29 U.S.C. § 1053(a)(2)(A)(ii). Thus, to satisfy ERISA, a defined benefit plan must allow an employee's interest in his or her accrued benefit to vest fully when the employee has completed five years of service with the employer.[3]

Two statutory definitions are critical to understanding this vesting requirement: First, as noted, under the Act, "accrued benefit" means, "in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and . . . expressed in the form of an annual benefit commencing at normal retirement age." Id. § 1002(23)(A). Second, the Act defines "normal retirement age" as "the earlier of (A) the time a plan participant attains normal retirement age under the plan, or (B) the later of (i) the time a plan participant attains age 65, or (ii) the 5th anniversary of the time a plan participant commenced participation in the plan." Id. § 1002(24). In plain English, this means that an employee's

---

[3] A "year of service" is defined by the statute as any consecutive 12-month period in which an employee completes 1,000 hours of service. 29 U.S.C. § 1053(b)(2)(A). As will be discussed further below, that is the same way the PwC plan defines a year of service.

7

accrued benefit is the amount she would receive annually as an annuity after she reaches normal retirement age, and normal retirement age is the earlier of a normal retirement age selected by the plan *or* a statutory default, which is usually age 65, unless the employee begins participating in the plan later than age 60, in which case normal retirement age is five years from that date.

In the 1980s and '90s, many companies created a third type of plan, known as a "cash balance" plan. Cash balance plans combine attributes of both defined contribution and defined benefit plans. They simulate the structure of defined contribution plans, but they are treated as defined benefit plans. Under cash balance plans, "employers do not deposit funds in actual individual accounts, and employers, not employees, bear the market risks." Hirt v. Equitable Ret. Plan for Emps., Managers, & Agents, 533 F.3d 102, 105 (2d Cir. 2008). Instead of an actual individual account, a participant in a cash balance plan has a hypothetical account, the value of which is "driven by two variables: (1) the employer's hypothetical 'contributions,' and (2) hypothetical earnings expressed as interest credits." Esden v. Bank of Boston, 229 F.3d 154, 158 (2d Cir. 2000). For this reason, "[c]ash balance plans are considered defined benefit plans under ERISA." Lonecke, 584 F.3d at 462. "As a result of this classification, the term

8

'accrued benefit' in a cash balance plan is expressed in the form of an annual benefit commencing at normal retirement age," just like the accrued benefit in a defined benefit plan.  Id. (internal quotation marks, citations, and alteration omitted); see also Berger v. Xerox Corp. Ret. Income Guarantee Plan, 338 F.3d 755, 757-58 (7th Cir. 2003); Esden, 229 F.3d at 158.

Generally with cash balance plans, interest credits continue to accumulate even after an employee terminates employment and until the benefits are distributed.  See Esden, 229 F.3d at 160.  Thus, if a vested employee leaves employment before reaching retirement age, his or her benefit at retirement will be based on the contributions made during employment, plus the interest accruing over time, both during employment and between the employee's departure and retirement age.  In a cash balance plan, the employer may offer the departing employee the option of either an annuity or a lump sum; however, "any such [lump-sum] payout must be worth at least as much, in present terms, as the annuity payable at normal retirement age."  Lonecke, 548 F.3d at 463 (internal quotation marks omitted); accord, Esden, 229 F.3d at 163.  In other words, plans are not required to offer participants a lump-sum distribution, but if they do, they cannot deprive the participants of the value that would accrue if the

9

participants waited and took their distributions as an annuity at normal retirement age.

The difference between the hypothetical value of a cash balance plan account at any given time and the value of the account as an annuity payable at normal retirement age is known as the "whipsaw calculation."[4] To determine the whipsaw calculation, the account balance is increased by the plan's interest rate multiplied by the time to normal retirement age, then discounted back to present value at a set rate, usually the rate on 30-year Treasury securities. See Esden, 229 F.3d at 159, 164 n.13. Assume, for example, that a benefit plan's normal retirement age is 65 and a 64-year-old employee has an account balance of $100,000. Assume further that the plan provides a corporate bond rate of return, which today is 8% – a rate that is 2% higher than the current Treasury rate of 6%. To determine the whipsaw-calculated lump sum, or "whipsaw payment," one increases the account balance by today's corporate bond rate, to get $108,000 at age 65; then discounts it back to present value at the Treasury rate. The

---

[4] One suspects that whoever coined that name for the calculation was not a fan of paying out that difference. We use the term, which has become standard, without any negative implication. It is simply a requirement derived from the obligation to equalize the value of the lump-sum payout at departure to the annuity payable at normal retirement age.

calculation then results in a lump-sum payment of roughly $102,000, as opposed to the account balance of $100,000.  See Barry Kozak, The Cash Balance Plan: An Integral Component of the Defined Benefit Plan Renaissance, 37 J. Marshall L. Rev. 753, 773 (2004).

Before turning to plaintiffs' lawsuit, we must note that the rule of actuarial equivalence and the whipsaw calculation just discussed are throwbacks to an earlier era of ERISA litigation.  Prior to 2006, several courts, including this one, had held that ERISA required whipsaw payments.  See, e.g., Berger, 338 F.3d at 762; Esden, 484 F.3d at 172-73; Lyons v. Georgia-Pacific Corp. Salaried Emps. Ret. Plan, 221 F.3d 1235, 1252 (11th Cir. 2000).[5]  That year, however, Congress passed the Pension Protection Act, which provided that plans did not fail to satisfy ERISA solely because they did not provide actuarial equivalence for participants who terminated employment before normal retirement age and took a lump-sum payment, and thus eliminated mandatory whipsaw payments.  Pension Protection Act of 2006, Pub. L. No. 109-280, § 701(a)(2), 120 Stat. 780 (2006),

---

[5] The IRS similarly took the position that if a cash balance plan allowed for a lump-sum distribution of vested benefits to participants before they attain normal retirement age, then any such lump sum had to be the actuarial equivalent of an annuity taken at retirement age.  See I.R.S. Notice, Cash Balance Pension Plans, 96-8, 1996-1 C.B. 359 (Jan. 18, 1996).

codified at 29 U.S.C. § 1053(f)(1)(B). Plaintiffs filed this suit in 2006,[6] and the

distributions at issue in it predate the passage of the Pension Protection Act. The

parties therefore agree that the Act does not apply to this case. See West v. AK

Steel Corp., 484 F.3d 395, 412 (6th Cir. 2007) (concluding that Pension Protection

Act does not apply retroactively).

With these principles in mind, we turn to plaintiffs' lawsuit.

II.     PwC's Retirement Plan and Plaintiffs' Suit

Plaintiffs are, and represent a class of, former PwC employees who

terminated their employment after completing at least five years of service at the

firm. Based on their years of service, plaintiffs had fully vested in PwC's

retirement plan, the Retirement Benefit Accumulation Plan for Employees of

PricewaterhouseCoopers LLP ("the RBAP" or "the Plan"). The RBAP is a cash

balance plan, funded entirely by the employer. The funds deposited by PwC into

the Plan, and represented in the participants' hypothetical individual accounts,

may be "invested" through various investment options at the election of the

employee, such as money-market funds or more aggressive strategies. Under

---

[6] As will be explained below, this case has had a complicated procedural history since it was filed in 2006, involving two motions to dismiss and a previous certification of interlocutory appeal by the district court.

some cash balance plans, the employer specifies the annual investment return; however, the RBAP does not guarantee any set rate of return. Instead, the balance in a participant's account appreciates or depreciates in the form of daily-adjusted interest credits, according to the participant's chosen investment option.

The RBAP permits participants either to receive their account balances upon termination of employment, provided they have fully vested, or to retain their account balances in the Plan after terminating employment, and to continue to accrue the interest credits as long as they remain participants – until age 70½ at the latest. Vesting under the Plan occurs after five years of service, with a year of service being defined as any 12-month period during which the employee worked at least 1,000 hours. Upon termination of employment (or anytime thereafter), an account can be distributed to the participant, at her election, in one of two ways: in the form of an annuity or in a lump-sum cash payment once the participant reaches normal retirement age. Of central importance here, however, the Plan defines "normal retirement age" as "[t]he *earlier* of the date a Participant attains age 65 *or completes five (5) Years of Service*" at PwC. Joint App'x at 337 (emphases added). In other words, for any employee who starts work at PwC

13

before age 60, her interest will vest *and* she will attain normal retirement age at the same time: after five years of service. For those employees, there is no time period between their vesting date and normal retirement age, and consequently no time in which interest credits would accrue between those dates. Thus, the PwC Plan eliminates the possibility of a whipsaw payment. Because vesting and the attainment of normal retirement age occur simultaneously under the Plan, if an employee takes out a lump-sum payment anytime after vesting, the account will, by definition, already be equal in value to the value possible at normal retirement age.

After fully vesting and terminating their employment with PwC, plaintiffs elected to receive lump-sum payments. Under the Plan, the amount of the lump sum was defined as the participant's vested account balance – *i.e.,* the specific cash balance at the time of the distribution. Plaintiffs sued, alleging that they were entitled to receive greater amounts based on a whipsaw calculation of their account balances.[7] What makes plaintiffs' claim for whipsaw-calculated

---

[7] As the foregoing discussion of the Pension Protection Act makes clear, plaintiffs' claim of entitlement to whipsaw payments depends on principles of actuarial equivalence that were in effect at the time they took their distributions but have since been abrogated by Congress.

payments unique, however, is that, under the terms of the RBAP, they were in fact *past* normal retirement age once they had vested, because the Plan defined "normal retirement age" as "[t]he *earlier* of the date a Participant attains age 65 or completes five (5) Years of Service" as an employee at PwC.  Joint App'x at 337 (emphasis added).  Plaintiffs alleged three flaws with this definition.

First, they alleged that it violated ERISA § 3(24), because that provision of the statute defines normal retirement age as "the time a plan participant attains normal retirement age under the plan."  29 U.S.C. § 1002(24)(A).  Plaintiffs argued that five years of service was not a "normal retirement age," and therefore that the RBAP's definition was not a "time a plan participant attains normal retirement age under the plan," as required by the statute.

Second, plaintiffs alleged that the Plan's definition violated the provisions of ERISA that were meant to prevent "backloading," which occurs when a covered employee receives disproportionately higher benefit accruals for later years of service and therefore disadvantages shorter-term employees.  See 29 U.S.C. § 1054(b)(1)(A)-(C); Lonecke, 584 F.3d at 464.

Third, plaintiffs alleged that they were not informed of the definition of "normal retirement age" in the Summary Plan Description ("SPD"), the

15

document provided to employees that explains the terms of PwC's plan. The omission, they contended, constitutes an independent violation of the notice requirements in ERISA's implementing regulations. See 29 C.F.R. § 2520.102-3; Frommert v. Conkright, 738 F.3d 522, 532 (2d Cir. 2013).

III.    Procedural History

Plaintiffs originally brought this action on March 23, 2006, and PwC moved to dismiss. On September 5, 2006, the district court, then-Judge Michael B. Mukasey, denied in part PwC's motion to dismiss, determining that the Plan's definition of normal retirement age based on years of service violated ERISA § 3(24), relying on our decision in Duchow v. New York State Teamsters Conference Pension and Retirement Fund, 691 F.2d 74 (2d Cir. 1982). Laurent v. PricewaterhouseCoopers LLP, 448 F. Supp. 2d 537, 545 (S.D.N.Y. 2006) ("Laurent I"). Because the normal retirement age set by the Plan was invalid, the district court set the normal retirement age for purposes of the Plan at age 65, which it characterized as the "statutory default." Id. at 546. The case was then transferred to Judge George B. Daniels, who denied a motion for reconsideration, but certified Judge Mukasey's opinion for interlocutory appeal. Laurent v. PricewaterhouseCoopers LLP, No. 06 Civ. 2280(GBD), 2007 WL 2363616

16

(S.D.N.Y. Aug. 17, 2007) ("Laurent II"). After we declined to hear the interlocutory appeal, the district court again denied reconsideration. Laurent v. PricewaterhouseCoopers LLP, No. 06 Civ. 2280(GBD), 2010 WL 5396089 (S.D.N.Y. Dec. 22, 2010) ("Laurent III"). Subsequently, plaintiffs filed a Second Amended Complaint on August 22, 2012. PwC again moved to dismiss, in light of intervening out-of-circuit precedent. The district court, now Judge Oetken, denied the motion to dismiss, but for different reasons than Judge Mukasey. Laurent v. PricewaterhouseCoopers LLP, 963 F. Supp. 2d 310 (S.D.N.Y. 2013) ("Laurent IV"). That decision is now before us on appeal.

In denying PwC's motion to dismiss the Second Amended Complaint, Judge Oetken first analyzed whether our decision in Duchow controlled the case, as Judge Mukasey had ruled. In Duchow, we rejected the defendant plan's reading of "normal retirement age" as incorporating a years-of-service requirement through its inclusion of the term "anniversary" in ERISA § 3(24)(B)(ii), because the ordinary meaning of "anniversary" "plainly denotes a date rather than the years between the date and the past event." 691 F.2d at 79. Judge Oetken determined that Duchow dealt exclusively with age-based requirements for vesting independent of length of service, and did not consider

17

the possibility of a service-based normal retirement age. Laurent IV, 963 F. Supp. 2d at 317. Thus, where Duchow referred to "age," it meant "'age' under § 203(a)," the nonforfeitability requirements, and interpreted only the anniversary provision of the statutory default, *i.e.*, the anniversary of commencing participation in a plan. Id.[8] Accordingly, the district court concluded that Duchow did not dictate that the RBAP's years-of-service definition violated ERISA. Id. at 318-19.

The district court then proceeded to analyze the statutory requirements. It noted that ERISA provided that "normal retirement age" can mean "the time a plan participant attains normal retirement age under the plan," but held that this definition did not confer limitless discretion on the plan sponsor to define any event or condition as the normal retirement age, such as "on the first occasion that a double rainbow appears over Tokyo, or when Meryl Streep wins her next Emmy, or when the plan participant consumes his fiftieth cupcake." Id. at 319. Instead, the statute must be interpreted in accordance with the ordinary meaning

_____

[8] Duchow did include dictum, the district court acknowledged, that relied on an assumption that normal retirement age would generally be defined in terms of age, but it did not prohibit a years-of-service based definition; "[r]ather, it recognized that § 203(a) imposes two requirements, one based on service and the other on normal retirement age." Laurent IV, 963 F. Supp. 2d at 317.

18

of its terms, so "normal," "retirement," and "age" must all be interpreted with some reference to their ordinary meaning. Id. at 320. The district court determined that the RBAP's retirement age was "'normal' in the sense that it applie[d] across the board, to every participant in the plan," and that "normal retirement age . . . does not control when employees must retire, but only when certain rights vest and how benefits are adjusted." Id. (internal quotation marks omitted), quoting Fry v. Exelon Corp. Cash Balance Pension Plan, 571 F.3d 644, 647 (7th Cir. 2009).[9] Therefore, it held, the RBAP's normal retirement age "is 'normal' and satisfies the 'retirement' requirement." Id.

But the district court concluded that defining "age" in terms of years of service was a "strained construction" that departed from the ordinary meaning of the word, and thus was inconsistent with the meaning of normal retirement age in ERISA. Id. at 321 (internal quotation marks omitted). The district court assumed that age could be defined in terms of an anniversary, such as "age [at hiring] + 5," but held that years of service – defined in terms of years in which the employee worked a minimum of 1,000 hours – is not the same as an anniversary.

_____

[9] The district court's discussion of the validity of the RBAP relied heavily on the Seventh Circuit's decision in Fry, which will be discussed more fully below.

19

Id. As the court explained, "As a matter of ordinary usage, the query 'what's your age?' should not be met with the response, 'the first time I went to work, as modified by an algorithm I'll now describe.'" Id. at 320. Accordingly, based on the statutory text's inclusion of the word "age," the district court concluded that the RBAP's normal retirement age was not an age, and therefore violated ERISA.[10]

As alternative bases for denying PwC's motion to dismiss, the district court determined that the RBAP violated ERISA's prohibitions on "backloading," which prevent retirement plan sponsors from evading the statute's minimum vesting requirements by keeping rates of benefit accrual low in the early years of an employee's service (when the employee is more likely to terminate employment prior to retirement), and concentrating accrual in the later years of service (when the employee is more likely to stay with the employer until retirement). See id. at 323 & n.6, citing H.R. Rep. No. 93-807 (Feb. 21, 1974), 1974

---

[10] The district court noted that this interpretation was consistent with the employee-protective purposes of ERISA because "[i]f pension plans were free to define normal retirement age without any meaningful limitation based on the 'age' requirement, . . . the role of the normal retirement age as a robust participant-protective mechanism in ERISA's vesting rules might be compromised." Id. at 321.

U.S.C.C.A.N. 4670, 4688 (explaining purpose of rule against backloading). The district court also concluded that the RBAP's plan documents, the SPDs, violated ERISA's notice requirements by misleading plan participants as to the Plan's definition of normal retirement age. Id. at 330.

The district court certified an interlocutory appeal on the foregoing issues, Laurent v. PricewaterhouseCoopers LLP, No. 06 Civ. 2280(JPO), 2014 WL 251986 (S.D.N.Y. Jan. 22, 2014) ("Laurent V"), and we granted leave to appeal, Laurent v. PricewaterhouseCoopers LLP, No. 14-314 (2d Cir. Apr. 22, 2014), ECF No. 1.

## DISCUSSION

I.    Standard of Review

We review the denial of a motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) *de novo*. See Drimal v. Tai, 786 F.3d 219, 223 (2d Cir. 2015). "Because on a 12(b)(6) motion a court must treat as true the pleading's factual allegations," we assume for the purposes of our review that the facts alleged in the complaint are true. Toussie v. Powell, 323 F.3d 178, 180 (2d Cir. 2003).

21

II.     Statutory Construction

As with any statute, our interpretation of ERISA's terms begins with the statutory text.  See Jimico Enters. v. Lehigh Gas Corp., 708 F.3d 106, 110 (2d Cir. 2013).  ERISA § 3(24) defines "normal retirement age" as "the earlier of –

> (A) the time a plan participant attains normal retirement age under the plan, or
>
> (B) the later of--
>
>> (i) the time a plan participant attains age 65, or
>> (ii) the 5th anniversary of the time a plan participant commenced participation in the plan.

29 U.S.C. § 1002(24).  Because the RBAP has its own definition of normal retirement age, this case concerns the proper construction of § 3(24)(A), "the time a plan participant attains normal retirement age under the plan."[11]  That

---

[11] The district court correctly recognized that our decision in Duchow v. New York State Teamsters Conference Pension & Retirement Fund, is not controlling, as Laurent I had held.  In Duchow, we held that ERISA "indicate[s] that two discrete vesting requirements are imposed, the first linked to age without regard to length of service and the second depending on the length of service without regard to age."  691 F.2d 74, 77 (2d Cir. 1982).  But our decision did not address a situation where "normal retirement age" under § 3(24) was defined by the *plan*; instead, Duchow was concerned the statutory definition of normal retirement age under § 3(24)(B), *i.e.*, the later of age 65, or, as the statute provided at that time, ten years after a plan participant commenced participation in the plan.  "In short," we held, "we are persuaded that Congress intended that an employee's pension rights would vest, irrespective of the length of his service,

22

definition must be read in context, however, and "with a view to [its] place in the overall statutory scheme." FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (internal quotation marks omitted); accord, King v. Burwell, No. 14-114, slip op. at 9 (U.S. June 25, 2015).

Considering the plain meaning of the text in the context in which it appears, it is immediately apparent that the statute confers considerable discretion on retirement plan creators to determine normal retirement age. The plain text allows for the selection of a retirement age "under the plan" as an alternative to the statutory default, and specifies that normal retirement age shall be the *earlier* of those two points in time. One can easily imagine why Congress would want courts to defer to employers' determination of a retirement age that is earlier than the default: in many jobs and industries, normal retirement occurs earlier than age 65. Employers of firefighters, ballerinas, or professional athletes, for example, could quite reasonably select a much younger normal retirement age than the statutory default. The structure of the statute therefore signals

---

either on his 65th birthday or on the tenth anniversary of his joining the plan, whichever occurred later, *unless the plan itself allowed earlier vesting*." Id. at 80 (emphasis added). Thus, Duchow reserved the question whether normal retirement age could be defined differently under a plan than as part of the statutory default, and consequently does not control the disposition of this case.

23

Congress's intent to give employers wide latitude in deciding whether it is reasonable for workers to retire at a given age – whether that is 62 or 65 for most office workers, 50 or 55 for law enforcement officers, and 35 or 40 for shortstops. These are discretionary calls for the plan sponsor to make, to which courts should defer.

PwC emphasizes that discretion, arguing that the statute "allows a [plan] sponsor to specify 'the time'" that a participant attains normal retirement age, with time meaning simply "a point or period when something occurs." Appellants' Br. at 25 (internal quotation marks omitted).  PwC argues that Congress placed no limits on when a plan could determine that normal retirement age had been reached, and "[c]onditions, if any, are left up to the sponsor." Id. at 27.  That does not mean, PwC agrees, that the district court's double rainbow, Meryl Streep, and cupcake examples are permissible under the statute – the definition of normal retirement age by a plan is still limited to a period of "time," and thus, according to PwC, so long as the plan designates a measure of time, it complies with ERISA.

But a closer reading of the statute compels the conclusion that it does not confer boundless discretion to select *any* point in or measure of time.  True,

24

§ 3(24)(A) permits plans to define a "time," but that is not simply any time: under the statute's plain terms, it must be "the time a plan participant attains *normal retirement age*." 29 U.S.C. § 1002(24)(A) (emphasis added). ERISA does not define normal retirement age as the earlier of age 65 or simply "the time set by the plan," nor "whatever age or date the plan provides," language that Congress could easily have adopted had that been its intended meaning.

Instead, the statute defines "normal retirement age" as the earlier of "the time a plan participant attains normal retirement age under the plan" or the statutory default of age 65 or the fifth anniversary of plan participation. The repetition of the phrase, "normal retirement age," in § 3(24)(A) is no mere tautology. Rather, it suggests that "the time" that a plan establishes as its normal retirement age must have some reasonable relationship to the age at which participants would normally retire. The statute does not define what "normal" or "retirement" mean, and where a statute does not define a term, we "give the term its ordinary meaning." Taniguchi v. Kan Pac. Saipan, Ltd., 132 S. Ct. 1997, 2002 (2012). "Normal" means "[c]onforming, adhering to, or constituting a usual or typical standard, pattern, level, or type," and, importantly, to "retire" means, *inter alia*, "[t]o withdraw from business or public life and live on one's income,

25

savings, or pension."  Am. Heritage Dictionary 848, 1055 (2d ed. 1982); accord,

Webster's New Riverside Univ. Dictionary 803, 1003 (2d ed. 1984).  Thus,

"normal retirement" does not, in its ordinary meaning, suggest anytime the

employer wishes, or whenever an employee leaves a company after a few years

on the job.  The plain meaning of the statute does not allow for an ordinary

industrial or financial services company to pick, say, 35 as its normal retirement

age, since such a company could not, under normal circumstances, reasonably

expect its employees to retire at that time.[12]

The district court's conclusion that the RBAP violated ERISA because it

defined normal retirement age in terms of years of service, rather than as a literal

age, placed undue emphasis on the word "age" to the exclusion of its modifiers,

"normal retirement."  Words in a statutory text should not be interpreted in

---

[12] Analogously, imagine that Congress offered subsidies to states that
protect the habitat of "whatever species the state selects as the state bird" (and, to
make the analogy even closer to ERISA, if the state does not select its own bird,
the statutory default is the bald eagle).  Such a statute clearly confers wide
discretion on each state to select any species of bird to be its state bird.  But a state
could not claim entitlement to the subsidies by picking a species of wildcat or
frog, simply because those are both "species."  Similarly here, the statute grants
leeway to plan sponsors to select any time that a participant attains normal
retirement age, but it cannot pick an age, date, or occurrence that bears no
plausible relationship to any conventional or anticipated retirement age.

26

isolation; "[o]ur duty, after all, is to construe statutes," not isolated words or phrases. King, slip op. at 9 (internal quotation marks omitted). There is no indication in the statute that normal retirement age must be a literal calendar age. To the contrary, the statutory default itself includes a variation on that theme, allowing normal retirement age to be defined as five years after the commencement of participation in the plan. See 29 U.S.C. § 1002(24)(B)(ii). Treating any literal calendar age as sufficient to meet ERISA's requirements also produces results wholly inconsistent with the statutory scheme. If any age will do, why can't PwC set 35 as its normal retirement age? Or 25? Or 12? Setting a normal retirement age at any of these calendar ages is no more consistent with the statute than defining normal retirement age as five years of service. PwC cannot reasonably expect its employees to retire at 35 any more than the National Basketball Association can reasonably expect its players to retire at 65. The problem with these numbers is not, of course, that they are not ages, but rather that they bear no relationship to *normal retirement* ages for their respective industries, and thus stretch the statute's words beyond what they can be reasonably interpreted to mean. Conversely, had PwC selected *30* years of

27

service as its normal retirement age, plaintiffs would be hard put to argue that

that is not a "time a plan participant attains normal retirement age."[13]

Reading the statute to permit plans to use any arbitrary age that suits the

employer as a "normal retirement age" would read that very phrase out of

§ 3(24)(A). Such a reading would also be inconsistent with the statutory default,

§ 3(24)(B), which defines normal retirement age as 65 or five years after hiring,

whichever is *later*. That definition is consistent with the ordinary understanding

of normal retirement age: 65 for most people, but with an exception for someone

who is hired within five years of her 65th birthday. And that commonsense

definition fits the "symmetrical and coherent regulatory scheme," Brown &

Williamson, 529 U.S. at 133 (internal quotation marks omitted), created by the

statute: requiring that plans pick an age that bears some relationship to typical

retirement age for workers covered by the plan advances the Act's stated purpose

of protecting employees "with long years of employment" from "losing

anticipated retirement benefits." 29 U.S.C. § 1001(a). Construing § 3(24) to

---

[13] Indeed, as will be discussed more fully below, Congress recently clarified that 30 years of service *is* an acceptable retirement age under the statute. See Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130, 2827 (2014), codified at 29 U.S.C. § 1054(k).

28

prohibit plans from selecting any age, simply because it is an age, is therefore consistent with the "broader structure of the Act." King, slip op. at 15, citing United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

The district court's alternate conclusion was based on an attempt to distinguish PwC's plan from the plan at issue in Fry v. Exelon Corp. Cash Balance Pension Plan. In that case, the Seventh Circuit upheld a plan that defined normal retirement age as "five years on the job." 571 F.3d 644, 646 (7th Cir. 2009). Like the RBAP, that was also the plan's vesting date, and thus the employees' first opportunity to demand a lump-sum distribution when terminating their employment. The Seventh Circuit held that the plan's definition did not violate ERISA, because:

> [T]he Plan's formula – the participant's age when beginning work, plus five years – is an "age." It is employee specific, to be sure, but "age + 5" remains an age. It is not as if the Plan provided that "an employee reaches normal retirement age when he owns ten umbrellas." The

29

> Plan's formula not only specifies an "age" but also is lifted right out of the statute. Subsection (B)(ii) defines as the highest possible "normal retirement age" (for a person hired at 65 or older) "the 5th anniversary of the time a plan participant commenced participation in the plan." Making that statutory definition of "normal retirement age" universally applicable can't be rejected on the ground that the formula does not yield an "age." ERISA does not require the "normal retirement age" to be the same for every employee; § 1002(24)(B)(ii) shows that too.

Id. at 647.

We respectfully disagree with the Seventh Circuit's conclusion that five years on the job is a permissible normal retirement age under ERISA, simply because it is an "age." Adopting its rule would permit PwC to pick an unreasonably low age as its normal retirement age, which would contravene the language of the statute, for the reasons described above. The Seventh Circuit's reliance on ERISA § 3(24)(B)(ii) for the conclusion that a five year anniversary normal retirement age is permissible takes that provision out of its statutory context. That subsection only applies if the fifth anniversary is *later* than age 65 – further evidence that the ages included in the statutory definition cannot be divorced from what we ordinarily think of as normal retirement.

30

The Seventh Circuit rejected the argument that five years on the job is not a "*normal retirement* age," however, because, it stated, ERISA "does not compel a pension plan's retirement age to track the actuarial tables." Id. (emphasis added) (internal quotation marks omitted). Instead, the court held, under § 3(24)(A), "an age is the 'normal retirement age' because the plan's text makes it so. The age in the plan is 'normal' in the sense that it applies across the board, to every participant in the plan." Id. Regarding "retirement," the court explained, "It is important to understand that a 'normal retirement age' in a pension plan does not control when employees must retire, but only when certain rights vest and how benefits are adjusted. That's why it makes sense to speak of an age being 'normal' to the plan's operation rather than to anyone's retirement prospects." Id.

Again we respectfully disagree. The statute sets as a default an age that anyone would recognize as a traditional age for retirement. It allows plans to set an earlier date, but that too must be a normal retirement age. The argument that a "normal retirement age" need not have any relationship to the age at which plan participants normally retire because the phrase is used to trigger certain benefits or adjustments rather than to mandate retirement is a non sequitur.

31

Congress could have chosen any age or triggering event, or allowed plans to select any such trigger, but it chose to tie the benefits and adjustments respectively governed by §§ 203 and 204 to a (plan-selected) "normal retirement age," presumably because it believed that the rights involved were best triggered by an employee's reaching an age that is reasonably so defined.

Moreover, there is no reason to think that ERISA's drafters meant by "normal" the ordinary age of retirement in one part of its definition, and "normal" merely in the sense of "applies across the board" in a different part of the same sentence. Such a reading would defy the "presumption that a given term is used to mean the same thing throughout a statute, a presumption surely at its most vigorous when a term is repeated within a given sentence." Brown v. Gardner, 513 U.S. 115, 118 (1994) (citation omitted). In any event, even in isolation from the present context, "normal" does not ordinarily mean "uniform," and had Congress wanted to mandate uniformity, it could have allowed plans to select "the time a plan participant attains *the uniform* retirement age under the plan."[14] Construing the statute consistently with the ordinary meaning of its

_____

[14] In fact, a requirement of uniformity would just as naturally follow if Congress had simply used the phrase "retirement age" without including "normal." It would be odd to construe a statute that permits an employer to set

32

terms and as a coherent whole, "the time a plan participant attains normal retirement age under the plan" must bear some reasonable relation to a time when the plan's participants would, under normal circumstances, retire. Five years on the job at an accounting firm is not a normal retirement age.[15]

Inasmuch as we find Fry's reading of the statute unpersuasive, we are similarly skeptical of the distinction between five "anniversaries" in Fry and five "years of service" in this case. The district court here recognized that five years of service, as calculated in increments of 1,000 hours, was a different measure of time than five anniversaries, because a year of service might not correspond to a chronological year. It therefore distinguished Fry and held that unlike the plan in that case, the RBAP violated ERISA because it did not pick an "age" as its normal retirement age. Laurent IV, 963 F. Supp. 2d at 321. But when one

_____

the "retirement age" for its employees to allow that employer then to vary that age from one employee to the next.

[15] We emphasize that this leaves plan sponsors with a great deal of discretion, to which courts must defer. Close scrutiny of a decision to set normal retirement age for purposes of a plan such as the RBAP at 58 or 60 or 62 would be inappropriate. The problem in this case is not that we disagree with PwC about what is a normal retirement age for its employees, but that the chosen age, having been selected to eliminate whipsaw payments rather than with an eye toward assessing what is a reasonable approximation of "normal retirement age," unsurprisingly bears no relationship at all to such an age.

33

considers the function of normal retirement age in the overall scheme of statutory protections, that distinction between anniversaries and years of service is revealed to be essentially semantic.

If an employee's fifth anniversary at the company and her five years of service coincide, there is literally no difference between how a years-of-service plan and an anniversary plan would treat that employee. The question, then, is whether the result differs if they do not coincide. Theoretically, under an anniversary plan, normal retirement age "under the plan" could be reached before the benefit has fully vested, if it takes an employee longer than five years on the job to fulfill five years of service. But in that situation, the employee would be no better or worse off than an employee whose normal retirement age is tied to years of service: neither would be entitled to a whipsaw payment because neither would have a normal retirement age that occurs subsequent to vesting. The alternative – vesting before anniversary – is impossible because it would take a minimum of five years on the job to obtain five years of service. Accordingly, there is no functional difference for employees between tying

normal retirement age to an anniversary and tying it to years of service.[16]

Because the PwC Plan and the plan in <u>Fry</u> are no different in their effect, it would elevate form over function to hold PwC liable for violating ERISA simply because it did not use the right words to eliminate a benefit to which its employees were entitled. If PwC could accomplish the same result permissibly under the statute by picking a normal retirement age of 35 or the fifth anniversary of hire, holding that it violated the statute by instead choosing five years of service would amount to little more than a "gotcha" outcome lacking any substantive protection for pension plan participants.

---

[16] The district court pointed to one difference between anniversaries and years of service that is more compelling, namely, that the completion of five years of service is *likely* to "cluster around employees' fifth anniversaries," but unlike anniversaries, a years-of-service metric does not provide a date-certain for employees' normal retirement age. <u>Laurent IV</u>, 963 F. Supp. 2d at 321. We agree with the district court that, consistent with ERISA's purposes of protecting retirees' settled expectations in anticipated benefits, normal retirement age cannot be too "nebulous" a benchmark, <u>id.</u>, but we do not think that the statute requires complete certainty. An employee with a normal retirement age that is defined by years of service will still be able to predict roughly when she will reach retirement under the plan, even if she does not know the date precisely. Furthermore, because the statute builds the less certain years-of-service benchmark into its minimum vesting requirement, it is clear that Congress was willing to tolerate such a moderate degree of unpredictability in the overall statutory scheme.

Accordingly, we do not find either the Seventh Circuit's reading of the statute or the distinction between anniversaries and years of service persuasive.[17] We nevertheless concur in the district court's determination that the RBAP is invalid, because five years of service is no more a normal retirement age than five years on the job. And the statute's text is clear that the time a participant attains normal retirement age under the plan must be just that: a *normal retirement* age.

III.    Consistency with Precedent

Our determination that the clear statutory text governs this case is sufficient to end the inquiry. See Tapia v. United States, 131 S. Ct. 2382, 2388 (2011). We find additional support for that conclusion, however, in the fact that PwC's interpretation of the statute would effectively nullify our decision in Esden v. Bank of Boston. The plan at issue in Esden had attempted to eliminate whipsaw payments by projecting the interest rate at 4% compounded annually,

---

[17] We agree with the district court that the Fourth Circuit's decision in McCorkle v. Bank of America Corp., 688 F.3d 164 (4th Cir. 2012), is unpersuasive. See Laurent IV, 963 F. Supp. 2d at 322 n.5. Plaintiffs in that case conceded that the defendant's plan's definition of normal retirement age was valid under § 3(24), and the Fourth Circuit's discussion of why, in its view, that "concession [wa]s well-counseled" was dicta that relied heavily on Fry and did not explore what, if any, limits the statute might place on a plan's discretion. McCorkle, 688 F.3d at 171.

36

notwithstanding the fact that the actual interest credits, though variable, could not accrue at a rate lower than 5.5%. See 229 F.3d at 161. Because the actual interest rate always exceeded the projected rate, "the Plan guarantee[d] that 'whipsaw' will never occur . . . [and a]s a consequence, the Plan w[ould] always pay out the Current Cash Account Balance." Id. We held that under ERISA, for any defined benefit plan (which, of course, a cash balance plan is), the accrued benefit must be valued in terms of the annuity that it will yield at normal retirement age, and the plan could not alter that entitlement based on the (plan-approved) time when, or form in which, an employee takes his or her distribution. Id. at 164. We noted that ERISA did not leave plans free to choose their own methodology for determining the actuarial equivalent of the accrued benefit; rather, we stated, "If plans were free to determine their own assumptions and methodology, they could effectively eviscerate the protections provided by ERISA's requirement of actuarial equivalence." Id. (internal quotation marks omitted). The driving force behind our decision was the various statutory limitations on the freedom of plan creation that ERISA imposes. See id. at 173 ("The Plan cannot contract around the statute."). Those limitations apply regardless of whether the plan in question permits participants to elect a

37

lump-sum payment at termination, rather than an annuity at retirement.  Plans

need not provide the opportunity for such an election, but where they do, a

"participant may not elect a forfeiture."  Id.

Esden does not directly control this case because the rule of actuarial

equivalence was there defined in terms of equivalence between the point at

which the participant elects to take a lump sum distribution and the participant's

normal retirement age (65 in that case).   The PwC Plan's elimination of the

whipsaw by foreshortening the time to normal retirement age therefore complies

with the *letter* of our decision.  But by pegging normal retirement age to the

vesting date, the Plan accomplishes the same result that we proscribed in Esden:

it effectively penalizes employees based on the time when, and form in which,

they take their distribution.  Had plaintiffs kept their accounts and not taken a

lump sum when they terminated their employment with PwC, their accounts

would have been valued differently (though not necessarily higher, because the

value of the accounts fluctuated based on whatever investment option each

participant chose) when they took an annuity later.  Therefore, taking the lump

sum at the termination of their employment deprived plaintiffs of the actuarial

equivalent of what their accounts would have been worth had they later taken an

annuity. Again, that is not technically a forfeiture under the statute, because forfeiture is defined in reference to normal retirement age. But in substance, the PwC Plan accomplishes precisely what we forbade in Esden, by choosing a methodology for calculating actuarial equivalence that effectively withholds that statutory protection from plaintiffs' accounts.

PwC argues that Esden recognized that there are ways a plan can permissibly avoid any whipsaw payout, and indeed, we said, "If the plan's projection rate (that is the hypothetical interest credits it provides) and the statutorily prescribed discount rate are identical, then the present value of the hypothetical account projected forward to normal retirement age determined by this computation will be exactly the current cash account balance." Id. at 165. Such plans may pay out the cash account balance as the actuarial equivalent of the accrued benefit. But that is not how PwC's plan is set up: the participant is given a number of options in which she can choose to have her hypothetical balance invested. If the investment were to yield a rate of return greater than the discount rate, the participant would effectively forfeit the difference by electing to take her distribution in a lump sum at the time of termination. That is exactly what we said a plan cannot do in Esden, though in that case the difference

39

between the future interest credits and the guaranteed minimum actual value of those credits could be precisely ascertained. See id. at 167. Here, we do not know what plaintiffs' accounts would be worth if they stayed in the Plan until age 65 – or, as the Plan permits, until age 70½ – but to the extent their value will exceed the discounted present value, defining normal retirement age in a way that coincides with vesting effects the kind of forfeiture that Esden forbids.[18]

---

[18] Put another way, as Judge Posner characterized the defendant's attempt to eliminate whipsaw payments in Berger v. Xerox Corp.:

> Xerox tells its employees who leave the company before they reach . . . [normal retirement] age that if they leave their money with the company they will obtain a pension beginning at age 65 that will reflect future interest credits. They are offered the alternative of taking a lump sum now in lieu of a pension later, but the lump sum is not the prescribed actuarial equivalent of the pension that they are invited to surrender by accepting the lump sum because it excludes those credits.
>
> They are, in short, being invited to sell their pension entitlement back to the company cheap, and that is a sale that ERISA prohibits.

338 F.3d at 761-62. Here, similarly, plaintiffs' election to take a lump sum when they terminated employment forced them to sell their accounts back to PwC for whatever they were worth at that time, rather than their value if taken later as an annuity.

IV.     <u>Other Considerations</u>

We pause to discuss two additional considerations that are relevant to our holding.

First, we acknowledge that our interpretation of the statute is not wholly consistent with that of the IRS, though its interpretation has shifted over time. The IRS has "primary jurisdiction and rule-making authority over ERISA's funding, participation, benefit accrual, and vesting provisions," <u>Esden</u>, 229 F.3d at 157 n.2, and ERISA itself provides that "[r]egulations prescribed by the Secretary of the Treasury under sections 410(a), 411, and 412 of Title 26 (relating to minimum participation standards, minimum vesting standards, and minimum funding standards, respectively) shall also apply to the minimum participation, vesting, and funding standards set forth in [ERISA]," 29 U.S.C. § 1202(c). Because the relevant IRS interpretation of "normal retirement age" is contained in a Revenue Ruling, not in a regulation subject to public notice and comment, it is "entitled to respect" only to the extent it has "the power to persuade," <u>Christensen v. Harris Cty.</u>, 529 U.S. 576, 587 (2000) (internal quotation marks omitted), and is not subject to <u>Chevron</u> deference. <u>See</u> <u>IRS v. WorldCom, Inc. (In re WorldCom, Inc.)</u>, 723 F.3d 346, 357 (2d Cir. 2013).

41

Even if it were entitled to deference, moreover, where the agency interpretation is inconsistent with the statute's plain meaning, we need not defer to that interpretation. See Gen. Dynamics Land Sys. v. Cline, 540 U.S. 581, 600 (2004) ("[D]eference to [an agency's] statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent."); cf. Hurwitz v. Sher, 982 F.2d 778, 782 (2d Cir. 1992) (explaining, under prior precedent that accorded great weight to the IRS's interpretations of ERISA, that its interpretations need not be sustained if "plainly inconsistent" with the statute (internal quotation marks omitted)).

Prior to the enactment of ERISA, an IRS Revenue Ruling provided that, to qualify for tax benefit status, a retirement plan could set its normal retirement age lower than age 65, but only if the age in the plan represented the age at which employees customarily retired in the particular company or industry, and was not a device to accelerate funding. Rev. Rul. 71-147, 1971-1 C.B. 116. Following the enactment of I.R.C. § 411(a)(8), the Internal Revenue Code's analogue to ERISA § 3(24), however, another Revenue Ruling permitted a plan to set normal retirement age at any age, including lower than age 65, *regardless* of the age at which employees customarily retired in the particular company or industry. See

Rev. Rul 78-120, 1978-1 C.B. 117.  That 1978 Revenue Ruling represented the IRS's position until 2007, when, in response to the passage of the Pension Protection Act, the agency changed course again and ruled – this time in a formal regulation following notice and comment, see IRS Notice 2007-8, In-Service Benefits Permitted to be Provided at Age 62 by a Pension Plan, 2007-1 C.B. 276 (Dec. 22, 2006) –  that "normal retirement age could not be earlier than the earliest age that is reasonably representative of a typical retirement age for the covered workforce."  72 Fed. Reg. 28604-01, at *28605 (2007).

Although it postdates the relevant period for this case and is prospective only, we find it noteworthy that the IRS's latest interpretation of the statute reverts to the agency's original position, requiring that normal retirement age be an age that is reasonably representative of the typical retirement age for the industry in which the covered employee worked.  That the agency has changed its position does not, in and of itself, suggest that we should not defer to the interpretation that was operative at the relevant time.  See Himes v. Shalala, 999 F.2d 684, 690 (2d Cir. 1993).  But given that the IRS's prior view was announced in a Revenue Ruling, while its current view followed from public notice and comment, we think it more likely that the IRS's current position represents the

43

agency's "fair and considered judgment on the matter." Esden, 229 F.3d at 169

(internal quotation marks omitted). Moreover, the IRS's current view coheres

more naturally with the text of the statute, and reinforces our conclusion that

ERISA does not permit a plan to pick any age as its normal retirement age,

regardless of whether it bears any resemblance to normal retirement. Cf.

Mellouli v. Lynch, 135 S. Ct. 1980, 1989 (2015) (declining to defer to agency

interpretation of statute where that interpretation "leads to consequences

Congress could not have intended" (internal quotation marks omitted)).

Consequently, the position of the IRS in the 1978 Revenue Ruling does not

persuade us of an interpretation of the statute contrary to the one we have

reached here.

Second, we note that a provision in the 2015 Appropriations Act provided

a "clarification" of the meaning of normal retirement age that applies

retroactively. Consolidated and Further Continuing Appropriations Act, 2015,

Pub. L. No. 113-235, 128 Stat. 2130, 2827 (2014), codified at 29 U.S.C. § 1054(k).

The new statute provides that, notwithstanding ERISA § 3(24), an "applicable

plan" does not violate any requirement of ERISA, or fail to have a uniform

normal retirement age, solely because the plan defines normal retirement age as

44

the earlier of (i) an "age otherwise permitted under section 3(24)" or (ii) 30 (or more) years of service. Id. "Applicable plan" is defined as any plan that sets normal retirement age on one of those two bases.

Plaintiffs contended at oral argument and in a post-argument supplemental brief that the new statute invalidates PwC's plan, because it precludes normal retirement ages based on less than 30 years of service. But the new statute does not say either way how Congress views a plan that defines normal retirement age based on *less* than 30 years of service; it merely states that a 30-year plan does not violate ERISA. In fact, the new statute cuts against plaintiffs' argument that years of service can never be an acceptable "age" under ERISA, because Congress recognized in its clarification the acceptability of a plan that included a years-of-service component. That shows that Congress is not averse to a years-of-service-based normal retirement age, in the same way that its use of an anniversary date in ERISA § 3(24)(B)(ii) shows that it is not averse to an anniversary-based normal retirement age. See Fry, 571 F.3d at 647. But that does not necessarily mean that plans may use those measures of time without limitation, any more than the fact that the statute uses a precise calendar age as its statutory default means that a plan could pick age 21 as its normal retirement

age. And it is instructive that Congress permitted a years-of-service normal retirement age that is sufficiently long that it bears a close relationship to what we ordinarily view as a time period after which it would be "normal" to retire. The new statute therefore neither permits nor precludes PwC's five-year plan.

Finally, PwC argues that even if the RBAP is invalid under ERISA, the district court erred by imposing 65 as a "default" statutory age to which the Plan must now adhere. It is not clear to us that the district court did anything of the sort. Although Judge Oetken stated that he "embrace[d] Laurent I's result," Laurent IV, 963 F. Supp. 2d at 315, that statement is more plausibly read, in the context of the court's further discussion, to concur with Judge Mukasey's denial of PwC's motion to dismiss, not necessarily to adopt the remedy that Judge Mukasey imposed.[19] Because it did not address the appropriate relief, we leave it to the district court to consider that question in the first instance.

---

[19] We note, however, that 65 is not only (part of) the statutory default normal retirement age, but it is also the default normal retirement age under the plan. See Joint App'x at 337 (defining normal retirement age "[t]he earlier of *the date a Participant attains age 65* or completes five (5) Years of Service" (emphasis added)). Since ERISA grants a private cause of action to enforce, *inter alia*, "the terms of the plan," 29 U.S.C. § 1132(a)(3), PwC may be compelled to "act 'in accordance with the documents and instruments governing the plan' insofar as they accord with the statute." US Airways, Inc. v. McCutchen, 133 S. Ct. 1537, 1548 (2013), quoting 29 U.S.C. § 1104(a)(1)(D).

46

## CONCLUSION

For the foregoing reasons, we hold that PwC's retirement plan violates ERISA, because five years of service is not a "normal retirement age" under the statute. Having so concluded, we need not reach the alternative bases for the district court's denial of PwC's motion to dismiss. Accordingly, the district court's denial of PwC's motion is AFFIRMED.